# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| GREGORY SEAMONS, | Case No.: 1:15-cv-00351 |
| Plaintiff, | |
| vs. | **MEMORANDUM DECISIONAND ORDER RE:** |
| A. RAMIREZ, R. VALLEY, III, TERRI JO KIRTLEY, | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** (Docket No. 46) |
| Defendants. | **PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL** (Docket No. 62) |

Now pending before the Court are (1) Defendants' Motion for Summary Judgment (Docket No. 46), and (2) Plaintiff's Motion for Appointment of Counsel (Docket No. 62). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.      BACKGROUND

Plaintiff Gregory Seamons complains that, while in administrative segregation housing at the Idaho Maximum Security Institution ("ISMI"),[1] he was limited to possessing a total of five books, which restricts his ability to practice his religion and to check out psychological self-help books from the library that have been recommended by his mental health provider. *See generally* Initial Review Order, p. 1 (Docket No. 6). Plaintiff also claims that he is entitled to regular in-person clergy visits, but is unable to receive them while in administrative segregation. *See id.* The circumstances informing these allegations are reflected in an array of

---

[1] Plaintiff is no longer housed at ISMI, having been "moved to the Utah State Prison in Draper, Utah as [his] sentence in Idaho expired." Notice of Change of Address (Docket No. 60).

correspondence involving Plaintiff and ISMI staff members, included, in relevant part, below and in chronological order:[2]

1.      **September 7, 2014:** "Offender Concern Form" from Plaintiff to Defendant R. Valley III ("Valley"), referencing an attached handwritten letter "concerning book policy" and stating: "I sincerely hope you'll give my letter serious consideration." 9/7/14 Offender Concern Form (Docket No. 3, Att. 3 at p. 3); *see also* Ex. A to Valley Aff. (Docket No. 46, Att. 10). The attached letter reads:

> Dear D. W. Valley
>
> I would first like to make it clear I'm not seeking a conflict, so please do not feel offended or attacked by what I have to say. My goal is to promote education, books and a review of that policy which limits books.
>
> General Population = 17
> Protective Custody = 10
> Ad Seg = 5
> Detention = 1
> excludes law books
>
> Concerns:
>
> 1. I have a memo dated 6-11-2014 signed by you and Warden Ramirez stating on 6-5-2014 a Committee placed me on long term Protective Custody but could not place in C-Block Protective Custody because I couldn't be housed with certain inmates. So I was being left in Ad-Seg until they could place me. So in many ways I feel I am still a protective custody inmate as I am not here for any punitive reasons whatsoever. I would like to be allowed to possess the 10 books allowed to protective custody as I do not own a T.V. and really all I want to do is study the Bible and History. I asked Chaplain Inman to talk to you as he knows I take several Correspondence Bible Courses.
>
> 2. I should be protective custody but can't be placed there for Institutional reasons not because of anything I've done wrong so I would like I.M.S.I to at least allow me the 10 books I should have in P.C.

---

[2] Significant overlap in dates exist when considering the various responses to Plaintiff's complaints over time. Therefore, each numbered paragraph is organized chronologically by the *initial date* of Plaintiff's correspondence to ISMI staff members, followed by the subsequent response(s) related to that correspondence within the same numbered paragraph.

Questions or Thoughts:

1. Six cubic feet of property is the same whether it's books or ramen noodles.

2. Protective Custody are either inmates who need protection or have been victimized. Why are they also being penalized and only allowed 10 books while the inmates in General Population who victimized the P.C. inmates allowed 17 books? It makes no sense.

3. Ad-Seg Inmates can have a $300.00 color T.V. with remote, Gangland T.V. channels, weekend videos, sexual content etc. etc. and a $150.00 MP4 music player with over $1000.00 worth of Gang rap songs and death metal racist music but I'm being restricted on educational and religious books, does that make sense?

This also costs the public tax payers millions of dollars in electric bills every year to watch sex and violence or listen to it on T.V.'s and MP4's. I think the public would rather see educational books and Bible Studies. I have thought of presenting these facts to outside sources but to tell you the truth I don't want conflict, I don't care if I stay in Ad-Seg until I leave 12-4-2017. I really only want to be approved for the 10 books I really should have so I can study.

4. I was somewhat shocked when I came here in 2012 it seems IMSI is not really trying to help inmates only warehouse them. I've been around here for 22 years 1992 it hasn't always been this way.

I hope you'll work with me and help me.

9/7/14 Letter (Docket No. 3, Att. 4, pp. 1-4); *see also* Ex. A to Valley Aff. (Docket No. 46, Att. 10). Administrative Assistant Kim Bausch responded on September 9, 2014, stating in relevant part:

Your correspondence to DW Valley is being returned to you with the following reminders:

- A description of the problem must be written within the appropriate area on **ONE** Offender Concern Form and there must not be any attachments included with the form.

- Offender Concern Forms must be handwritten and legible. An Offender Concern Form that is difficult to read or understand may be returned to the offender with instruction to make it legible or clearly explain the issue. If staff decides it is necessary to obtain more information, a staff member may interview the offender or request additional explanation.

**MEMORANDUM DECISION AND ORDER - 3**

- Vague issues/complaints, offender personal attacks on staff (e.g., the use of profanity or name calling), or harassment of staff will be cause for staff to not accept the Offender Concern Form.

- Offenders must address the Offender Concern Form to the appropriate staff member. For example, sending the form to a facility head or deputy warden when it should have gone to the property officer, will only delay the process.

You may check with your unit sergeant if you are unsure of this process. Any correspondence that is not in accordance with S.O.P. 316.02.01.001 will be returned.

9/9/14 Memorandum (Docket No. 3, Att. 3, p. 18) (emphasis in original); *see also* Ex. A to

Valley Aff. (Docket No. 46, Att. 10).

    2.    **September 24, 2014:** "Offender Concern Form" from Plaintiff to Valley, stating:

The Book policy (5 books for Ad-Seg) is outdated and illegal. This does not even allow me enough books to follow my religion. I have (one) Bible Concordance, (one) dictionary, (one) NKJV Student Bible, (one) KJV Bible and (one) NIV Bible. I use all 5 of these everyday for my numerous bible correspondence courses and religious purposes. This leaves no room for library, education, history, entertainment, or to receive any publications or opinions by mail which is a First Amendment legal right under freedom of speech and freedom of religion. I also am a medium security P.C. inmate.

9/24/14 Offender Concern Form (Docket No. 3, Att. 3, p. 7); *see also* Ex. B to Valley Aff.

(Docket No. 46, Att. 11). Valley responded on September 26, 2014, stating: "The Ad-Seg

property limits are set by SOP 320. IMSI is held to SOP 320. The limits are set." *Id.*

    3.    **September 29, 2014:** "Grievance/Appeal Form" from Plaintiff, stating:

The problem is: The number of books allowed to me in Ad-Seg under SOP 320 is (5) five this does not even allow enough books for me to exercise my religious rights under the First Amendment nor my right to freedom of speech (freedom to read) under the First Amendment. Also, Ad-Seg is not punitive, also I am medium custody, also I am supposed to be P.C.

I have tried to solve this problem informally by: Concern and letter to Chaplain and D.W. Valley rejected, concern to Sgt. Governor denied, concern to D.W. Valley denied. Grievance returned to be revised.

I suggest the following solution to the problem: The Book Policy is old and needs to be revised to allow enough books to study religion and history like I do as I do productive things like learn instead of watch Gangland T.V. which isn't regulated.

9/29/14 Grievance/Appeal Form (Docket No. 3, Att. 3, p. 4).

4. **October 7, 2014**: "Offender Concern Form" from Plaintiff to Defendant Terri Jo Kirtley ("Kirtley"), stating:

I was referred to you by A. Pitzer concerning SOP 320 (Book limits). Our limit in Ad. Seg is 5 (five) books this includes Religious books. Five books does not even allow me enough books to exercise my First Amendment Right to exercise my Religion or my First Amendment right to Freedom of Speech also known as (Freedom to Read). I have (1) Bible Concordance, (1) Dictionary, (1) NKJV Student Bible, (1) KJV Bible, (1) NIV Bible. That allows no room for education, self help library, art, or mailed in religious commentary, daily devotions etc. Also I'm medium custody P.C. waiting on a bed.

10/7/14 Offender Concern Form (Docket No. 3, Att. 3, p. 6); *see also* Ex. A to Kirtley Aff. (Docket No. 46, Att. 29). Kirtley responded that same day, stating: "Per policy that is all you will be allowed in Ad Seg." *Id*.

5. **October 14, 2014**: "Grievance/Appeal Form" from Plaintiff, stating:

The problem is: SOP 320 is outdated and illegal. I am only allowed five total books. This does not allow me enough books to exercise my Freedom of Religion or Freedom to Read covered by Freedom of Speech in the First Amendment of the United States Constitution.

I have tried to solve this problem informally by: Numerous Concern forms to staff receipts included, two rejected Grievances included, letter to D.W. Valley rejected, also included.

I suggest the following solution for the problem: The law is clear on Freedom of Religion and Freedom of Speech (freedom to read) also Ad-Seg is not a punitive classification. (1) Change the Policy, (2) Move me or (3) Prepare for Court. I will not let this go.

10/14/14 Grievance/Appeal Form (Docket No. 3, Att. 3, p. 1); *see also id*. (Docket No. 3, Att. 2, p. 17). On November 3, 2014, Kirtley provided the "Initial Response," stating:

5 Books is all that is allowed per policy in administrative segregation. The property limits change with custody levels for safety and security reasons. You are more

than welcome to read as many books as you would like, however you may only have 5 in your property at one time. I would recommend that when you finish a book you donate it, send it home or just request books from the library. With 5 books authorized that is enough to cover your religious concerns and other reading material. Your request is denied.

11/3/14 Initial Response (Docket No. 3, Att. 2, p. 17); *see also* Ex. B to Kirtley Aff. (Docket No. 46, Att. 30). On November 4, 2014, Valley provided a "Reviewing Authority Response," stating:

There is no limit on the amount of materials you are allowed to read. SOP 320 only limits the amount of books you may have in your possession at any one time to 5. We will continue to follow SOP regarding this issue. Your request for SOP to be changed is denied. Your current placement in Administrative Segregation negates your ability to move and the placement is appropriate.

11/4/14 Reviewing Authority Response (Docket No. 3, Att. 2, p. 18); *see also* Ex. C to Valley Aff. (Docket No. 46, Att. 12). On November 7, 2014, Plaintiff submitted an "Offender Appeal," stating:

The book policy does not allow enough books in Ad-Seg to exercise Freedom of Religion or Freedom of Speech (Freedom to Read). D.W. Kirtley has no clue how many books it takes to exercise the Christian religion. Her response is ridiculous and presumptive etc. Ad-Seg is not a punitive classification. I am a medium custody, Protective custody inmate who is being punished without cause.

I have tried to solve this by: multiple letters, multiple concerns, multiple grievances.

I suggest the following: (1) Change the book policy (2) Move me (3) Prepare for Court, also (4) allow me a memo to study my religion and have the books I need. You people will not limit my religion and then allow unlimited Gangland T.V. and Gang songs.

11/7/14 Offender Appeal (Docket No. 3, Att. 2, p. 18). On November 24, Defendant A. Ramirez ("Ramirez") provided an "Appellate Authority Response," stating: "We will continue to follow SOP in regards to property limits."). 11/24/14 Appellate Authority Response (Docket No. 3, Att. 2, p. 18); *see also* Ex. C to Ramirez Aff. (Docket No. 46, Att. 20).

6. **October 30, 2014:** "Offender Concern Form" from Plaintiff to Chaplain Wright ("Wright"), stating:

> Griffin v. Coughlin, 743 F. Supp. 1006, 1025-29 (N.D.N.Y.) 1990 protective custody inmates were entitled to religious consultations in a private setting rather than at the bars of their cells. I have requested an in person clergy visit, I have not had one in over a month, I don't want you to visit A block, I want you to visit me. You can either give me clergy visits or go to court it's your choice. Todd Inman is gone and the gloves are off.

10/30/14 Offender Concern Form (Docket No. 3, Att. 3, p. 15). Wright responded on October 31, 2014, stating: "What is your faith preference, I will see if I can find a volunteer to visit you." *Id.*

7. **November 6, 2014:** "Offender Concern Form" from Plaintiff to Ramirez, stating:

> Sir I have a grievance appeal on the book policy headed your way. Before you deny or reject my appeal would you please come talk to me. My concern is mostly religious books. I take several Mail Bible Correspondence Courses and I am intensely studying Theology and World History as it relates to the Bible plus exercising my own religion it takes more than 5 books. Plus I'm a medium custody non-problematic inmate. Thank you.

11/6/14 Offender Concern Form, attached as Ex. A to Ramirez Aff. (Docket No. 46, Att. 18). Ramirez responded on November 12, 2014, stating: "I will speak with you before making a decision." *Id.*

8. **November 10, 2014:** "Offender Concern Form" from Plaintiff to Wright, stating:

> My faith is non-denominational Christian. I have been trying to get an in person clergy visit for over two months. I would like to have one a week.
>
> I would also like to meet with you but you have been elusive and uncooperative also. this is a prison full of human beings not a warehouse.

11/10/14 Offender Concern Form (Docket No. 3, Att. 3, p. 16) (emphasis in original). Wright responded on November 11, 2014, stating: "I perform regular tier visits as per policy. If an inmate is sleeping or engaged in conversation through the vents, I move on to the next . . . cell." *Id.*

**MEMORANDUM DECISION AND ORDER - 7**

9.  **November 15, 2014:** "Offender Concern Form" from Plaintiff to Valley, stating:

> I have been trying to get an out of cell in person clergy visit for over two months. I have sent three or four concern form requests to RAC Wright who refuses my clergy visits and requests to meet him. Todd Inman was a great chaplain but this new guy Wright won't help me at all! I need a clergy visit please. Thank you.

11/15/14 Offender Concern Form (Docket No. 3, Att. 3, p. 9); *see also* Ex. D to Valley Aff. (Docket No. 46, Att. 13). Valley responded on November 17, 2014, stating: "You will need to work with RAC Wright to get access to services." *Id.*

10.  **November 19, 2014:** Plaintiff provided an "Offender Grievance Information," stating:

> The problem is: I am being denied out of cell, in person Clergy visits. I have not had one in approximately two months since Todd Inman was our Chaplain.

> I have tried to solve this problem informally by: Multiple concern form requests to RAC Wright to request a clergy visit and a concern to Deputy Warden Valley.

> I suggest the following solution for the problem: I want out of cell, in person clergy visits preferably once a week.

11/19/2014 Offender Grievance Information (Docket No. 3, Att. 2, pp. 1, 14). On December 9, 2014, Wright provided an "Initial Response," stating: "Regular tier visits are completed as outlined in SOP 403.02.01.001. A religious volunteer has also been contacted as outlined in the aforementioned policy." 12/9/14 Initial Response (Docket No. 3, Att. 2, pp. 1, 14). On December 17, 2014, Valley provided a "Reviewing Authority Response," stating: "Per SOP a request has been submitted for a religious volunteer to visit with you per your request. These visits will be cell side." 12/17/14 Reviewing Authority Response (Docket No. 3, Att. 2, pp. 1, 14); *see also* Ex. E to Valley Aff. (Docket No. 46, Att. 14). On December 29, 2014, Plaintiff submitted an "Offender Appeal," stating:

> I am being denied out of cell in private Clergy visits as outlined by the law in Griffin v. Coughlin, 743 F. Supp. 1006, 1025-29 (N.D.N.Y.) 1990, protective custody

inmates were entitled to religious consultations in a private setting rather than at the bars of their cells, or as D.W. Valley says "cell side" through the door.

I have tried to solve informally by: Multiple offender concerns forms and an inmate grievance.

I suggest the following: I have a right to private out of cell clergy visits and I want them please as soon as possible.

12/29/14 Offender Appeal (Docket No. 3, Att. 2, p. 15). On January 16, 2015, Ramirez provided

an "Appellate Authority Response," stating: "SOP is being followed by staff regarding religious

visits." 1/16/15 Appellate Authority Response (Docket No. 3, Att. 2, p. 15); *see also* Ex. F to

Ramirez Aff. (Docket No. 46, Att. 23).

11. **December 14, 2014**: "Offender Concern Form" from Plaintiff to Ramirez,

stating:

Spoke to you Friday about Religious issues. You said to send you a concern so you could put me on your calendar to visit me. I would really like to work this out with you and prevent a lawsuit as I'm still paying for the filing fee on my last one. As I said, all I have is Jesus. I will not give up my issue of Clergy visits and religious books. I look forward to talking to you also about how long I'll be in Ad-Seg.

12/14/14 Offender Concern Form (Docket No. 3, Att. 3, p. 8); *see also* Ex. D to Ramirez Aff.

(Docket No. 46, Att. 21). Ramirez responded on December 16, 2014, stating: "Please provide to

me in writing exactly what it is you are trying to get accomplished. This will help me to better

prepare." *Id*.

12. **December 17, 2014**: "Offender Concern Form" from Plaintiff to Ramirez,

referencing an attached handwritten letter. *See* 12/17/14 Offender Concern Form, attached as

Ex. E to Ramirez Aff. (Docket No. 46, Att. 22). The attached letter reads:

Thank you for allowing me to write you concerning Religious (Clergy) visits and Religious Books.

I have a life sentence, I'll never be physically free. All my family is either dead or estranged from me. Two years ago in Unit 8 I gave my life to Jesus. At that time Warden Blades talked to me and I was amazed at the kindness and integrity he had.

When I got here at IMSI about Nov 2012 I was also amazed. This place is nothing like it was in 1992 when I first got here to F.D.U. in E-Block. Everything is locked down, there are little to no Clergy visits, etc. etc. etc. etc. Staff don't want to take us out of our cell for mental health or nothing. It's become a warehouse for human beings.

What I personally want from you is at least 2 out of cell personal clergy visits per month, and a Memo allowing me to possess the number of Religious books I need to study and exercise my Religion. I do realize the Gang activity and violence etc. that has existed and Staff deal with daily is why many Staff are hard hearted and IMSI has many restrictions.

"But" I am a medium custody, protective custody inmate who hasn't had a class A or B D.O.R. since 2007. I am housed in Ad-Seg because you can't house me in protective custody right now. That's fine, I can't stand inmates anyway. I want to be left alone to study Jesus and have Clergy visits. You can take whatever you want from me except Jesus and my Religious books, otherwise I have no choice but to sue for First Amend Violations over books and religion. And according to all I've been reading I stand on good grounds but I don't want to sue I'm not your enemy just let me have my religious books and visits and I'll shut up. Please. I personally am no threat to you or your staff ask any A-Block Staff I am good to all of them. Please work with me. Maybe I can be issued a Memo for Religious Study since I take so many Bible Correspondence Courses?

*Id*. Ramirez responded on December 18, 2014, stating: "Mr. Seamons, thank you for the information. I will have the housing Lt. and VRC meet with you to determine the appropriate course of action based on your request and SOPs." *Id*.

13. **December 21, 2014:** "Offender Concern Form" from Plaintiff to Valley, stating:

By your order to me in writing Clergy visits are "cell side" through the door. Tonight a Volunteer Clergy Person came through the unit and stopped at my cell but I could not hear him because other inmates were singing rap songs in the vents and using the F-word etc. How can I have a spiritual or Reverent Clergy visit under these circumstances?

12/21/14 Offender Concern Form, attached as Ex. F to Valley Aff. (Docket No. 46, Att. 15).

Valley responded on December 29, 2014, stating: "I understand your situation is not ideal. Being in administrative segregation, your options are limited. Please do your best to make the most of these visits." *Id*.

14.    **December 26, 2014:**  "Offender Concern Form" from Plaintiff to "Grievance Coordinator," stating:

> You returned a Grievance Appeal to me today for Grievance IM 140000752 concerning Clergy visits.  You said I could not appeal until I received an answer which I did receive on 12-18-14 from D.W. Valley.  I returned the appeal to you with proof of the answer.  My appeal is valid and according to policy.

12/26/14 Offender Concern Form (Docket No. 3, Att. 3, p. 5).  A. Pitzer responded on December 29, 2014, stating: "I did not see a copy of the grievance attached to the appeal, so I need your grievance number written on the form."  *Id.*

15.    **January 26, 2015:**  Plaintiff submits a "Notice of Claim" related to the "2013-Jan 26, 2015" timeframe, stating:

> Cause of Damages:  Prison refuses in person clergy visits, also limits books to (5) five which does not allow enough to exercise religion or 1st Amendment rights.

> Witnesses:  All restrictive housing inmates are subject to these illegal policies with slight variations in book limits. . . . .

> Personal Injury:  No physical injury except mental health from no clergy visits, no communion, not enough books to study religion.

> Property Damage:  On 1-23-15, Officer Cowan took (3) three religious books from me (2) two being Bibles, yet he did not list the Bibles.  These Bibles were my legal property with my name stamped in them.

1/26/15 Notice of Claim (Docket No. 3, Att. 2, p. 13).

16.    **May 4, 2015:**  "Offender Concern Form" from Plaintiff to Wright, stating:

> Will you set me up with a Clergy Visit with either Dave Browning or whoever volunteers in B-Blk?  Thanks.  Have a good week.  I know you're limited by the Regime, but thanks for doing what you can.

5/4/15 Offender Concern Form (Docket no. 3, Att. 3, p. 12).  Wright responded on May 5, 2015, stating: "I spoke with Dave last week.  I will follow up to see when he is coming out.  I'll stop by this week.  Thanks for being understanding."  *Id.*

17.    **May 18, 2015:**  "Offender Concern Form" from Plaintiff to Wright, stating:

I have been here almost a month and have requested a Clergy visit at least twice and no one has showed up. I don't know what's up with Dave Browning, but please send me whoever is available. Also, can you send some thank you and thinking of you cards? Thank you.

5/18/15 Offender Concern Form (Docket No. 3, Att. 3, p. 13). Wright responded on May 22, 2015, stating: "I have a set of Catholic volunteers that come every Wednesday. I'll bring them by, usually after 11:00 count." *Id.*

18. **May 23, 2015:** "Offender Concern Form" from Plaintiff to Wright, stating:

You know I'm not a Catholic. I'm a non-denominational Christian. Why would you bring a Catholic Clergy person to me? Please send me a Christian Clergy person [undecipherable].

5/23/15 Offender Concern Form (Docket No. 3, Att. 3, p. 14). Wright responded on May 29, 2015, stating: "You asked for a volunteer – I brought a volunteer." *Id.*

19. **July 24, 2015:** Plaintiff submits a letter to the then Director of the Idaho Department of Corrections, Kevin Kempf, stating:

I have been trying to avoid a Civil Rights suit pertaining to these issues for some time but it seems unavoidable. I am writing you this letter in hopes you will consider my concerns and review some of the policies and possibly revise them.

Lawsuits cause tension in the prison and they cost everyone time and money.

(1) Currently in the Ad-Seg we are only allowed (5) five books this causes a great problem for me. I am a Christian and my (5) five books are: (1) KJV Authorized Version Bible, (2) NKJV Study Bible, (3) Bible Concordance, (4) Dictionary, (5) NIV Bible for several basic and advanced Bible Correspondence Courses I am enrolled in such as Crossroad Bible Institute that <u>require</u> an NIV Bible for this study.

This does not include a hymn book or a daily devotional which both could be considered necessary for <u>daily</u> worship also.

Idaho also has a large Mormon population and their faith has at least 5 books: (1) bible KJV, (2) Book of Mormon, (3) D & C, (4) Pearl of Great Price, (5) Gospel Principles, 6) Hymn and they could require a Concordance and Dictionary also. This is all simply for daily worship, but IDOC [(Idaho Department of Corrections)] policy only allows 5 (five) books.

This effects daily worship (Freedom to Exercise Religion). And with 5 religious books I now cannot check out any more library books for self-help, education, personal history studies (and I study British Royal History, Early Church History, Genealogy) etc. I am not able to order or receive books from various Christian Ministries (Commentaries). This violates Freedom of Speech also called (Freedom to Read). Deputy Warden Kirtley says to read my books and then donate them so I can get more. But which of my 5 basic religious books do I donate that I need everyday? Mental Health Clinician Shannon Nichols wrote me and told me she offers no Mental Health Services or counseling except crisis care (a pill or a suicide cell) she sent me a lengthy multi-page list of self-help books in our library that I can check out. This effects my 5 book limit also, again which of my necessary daily worship books do I sacrifice so I can get a mental health book? Why should I be forced to choose between religion and mental health or anything else?

Why are legal books <u>not</u> limited but religious ones are? Case law clearly states not only do we have a right to receive religious Commentaries but the authors and Church leaders have a right to send them to us etc.

When I'm not in Ad-Seg, I'm in Protective Custody due to my charges. P.C. is only allowed 10 books and General Population gets 17. Most inmates in protective custody are there because they've been assaulted or victimized by someone in the general population and need staff to protect them. Why are they being penalized 7 books for being victimized? this makes no sense. The Federal Court Judges have also said Ad-Seg is <u>not</u> a punitive classification so why is IDOC punishing me and taking away 12 of my 17 books?

Some may claim (security risk), what's the risk? Used as weapons? Legal books are not limited so inmates can still get what they need even hardback books such as "West's Rights of Prisoners" used for fire? Policy says we can have six cubic feet of property so six cubic feet of paper or books is all the same and poses the same risk yet paper is legal, books are not.

What I don't understand is that Ad-Seg inmates can purchase a color T.V. with cable T.V. with shows like "Locked Up," "Gangland TV," or "Sons of Anarchy" and others that glorify violence, gang violence, drugs, rape spouse abuse, etc. etc. and watch unlimited episodes of these yet I can't have a few books to learn and study the Lord.

(2) Clergy visits. I've been trying to have Communion since before last Christmas, it finally happened yesterday when my Pastor from Utah drove all the way here to do this. Our visit was not private as outlined by law in Griffin v. Coughlin, 743 F. Supp. 1006, 1025-29 (N.D.N.Y.) 1990. The sign behind my Pastor's head said our visit was recorded and monitored. Our Wardens refuse in person private clergy visits which is a major violation of the First Amendment. E and G Block workers get weekly Bible Studies, Services, Clergy Visits, etc., but Ad-Seg is almost completely excluded except for a volunteer to come stand and yell through our door occasionally. Etc. etc.

I am tired of being worried staff are going to confiscate and take my Bibles and Christian books as they have before. As you are reading this, please know I am writing a Federal 1983 suit against this prison for all these issues and the 2013 tort claim issue with sewage. I will wait until approx. Aug. 15th before I send it to the Courts. If you will work with me at least on book limits so I can study and practice my faith, I will be happy. This is a reasonable request and I hope you will consider it.

7/25/15 Letter (Docket No. 3, Att. 2, pp. 6-12) (emphasis in original). On August 19, 2015, Brett

Phillips, Management Assistant with the Office of the Warden, responded, stating:

Your above referenced correspondence to Director Kempf was forwarded to Warden Ramirez for review and response. That review has been completed, therefore your materials are being returned to you for the following reason(s):

- The issues referenced in your letter have been addressed, grieved and appealed. Additionally, you have received a response to all of your concerns.

Thank you for your cooperation in this matter.

8/19/2015 Memorandum (Docket No. 3, Att. 2, p. 3).

20. **August 3, 2015:** "Offender Concern Form" from Plaintiff to Wright, referencing

an attached handwritten letter "concerning my request for a religious studies memo from Warden

Ramirez." 8/3/15 Offender Concern Form (Docket No. 3, Att. 4, p. 8). The attached letter reads:

I met Bruce Land on Sunday, we visited and he prayed for me. I spoke to Case Manager Drake on Friday about my dilemma concerning book limits. She strongly suggested I write you to try to get me approved through the Warden for a Religious Studies memo to have more than 5 books.

According to Pastor Gary D. Anderson of Capitol City Christian Church I am one of 18 Idaho Inmates who are heavily enrolled in Bible Correspondence Courses. I am enrolled or involved with (1) Crossroad Bible Institute, (2) Salvation Army (Long Beach, CA), (3) American Bible Academy (Joplin, MO), (4) Gospel Express (N.C.).

And I've graduated several others. Some of these require an NIV Bible. I do not like the NIV but must have it for these studies. For my personal worship on a daily basis and my own personal study, I use (1) KJV Authorized Bible, (2) NKJV Study Bible, (3) Bible Concordance, (4) Dictionary, (5) Daily Devotional.

Those are bare bones necessities which leaves no room for Christian Commentaries which I get all the time, Hymn books, library books, Christian library books, self-help, mental health, self study, entertainment or any other books. Even Mormons have more than 5 books: (1) KJV Bible, (2) Book of Mormon, (3) Pearl of Great Price, (4) D & C, (5) Gospel Principles, (6) Hymn, (7) Concordance, (8) Dictionary.

I have lost more than 20 Religious Books and Bibles in cell searches. This is my last try for Diplomacy if you can't help me I will file the lawsuit I have already written and if that don't work, I will go totally insane and go from there.

Here's what I need:

5 Personal Daily Worship books: (1) KJV Bible, (2) NKJV Study Bible, (3) Bible Concordance, (4) Dictionary, (5) Daily Devotional.

1 Correspondence Courses (1) NIV Bible (Correspondence Courses)

3 Commentaries (via mail) various Ministries send them to me all the time.

3 <u>Personal</u> = self-help, self-study, library, entertainment.

total <u>11</u>

I am supposed to have 17 like everybody else but I can survive on 11. Thanks for your help.

8/3/15 Letter (Docket No. 3, Att. 4, pp. 9-11). Wright responded on August 11, 2015, stating: "I need the request on the concern form, please." 8/3/15 Offender Concern Form (Docket No. 3, Att. 4, p. 8).

21.     **August 7, 2015:** "Offender Concern Form" from Plaintiff to Ramirez, stating:

Can you explain to me why IMSI can spend thousands of dollars to install electric equipment for wireless media players (JP5). But cannot or will not install cameras or cages, facilities for private, in person clergy visits as outlined by the Federal law in Griffin v. Coughlin, 743 F. Supp. 1006, 1025-29 (N.D.N.Y.) 1990? I'm sure the media players are much more profitable for the IDOC since inmates purchase music and e-mails via this problem. What about God? What does he get?

8/7/15 Offender Concern Form (Docket No. 3, Att. 4, p. 5). Ramirez responded on August 17, 2015, stating: "Mr. Seamons, the JP4/5 wireless costs are absorbed by the contractor who sells the JP4/5." *Id.*

22.    **August 12, 2015**:  "Offender Concern Form" from Plaintiff to Wright, stating:

> Per your directive:  Concerning book limit of five (5).  I am enrolled in five Bible Correspondence Courses.  Two are College level.  All require extra books and Bibles.  Crossroad requires an NIV Bible as do some of the others.  Salvation Army and Crossroad send books to read as Commentary and part of the lessons.  My daily personal worship books already use up my (5) book limit.  I need a Memo for Religious Studies to authorize me to possess more than (5) books so I can continue my Education.  Thank you.

8/12/15 Offender Concern Form (Docket No. 3, Att. 3, p. 17).  Wright responded on August 21, 2015, stating:  "I spoke to admin and was informed this has already been through the grievance process."  *Id*.

From this, Plaintiff brought the following "claims" against Defendants Ramirez, Valley, and Kirtley:  (1) First Amendment – Religion, (2) First Amendment – Free Speech, (3) injunctive relief under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), (4) the Religious Freedom Restoration Act ("RFRA"), and (5) Eighth Amendment – Mental Health.  *See generally* Compl. (Docket No. 3); *see also generally* Initial Review Order (Docket No. 6).  Following an initial review of Plaintiff's claims under 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b), the Court determined:

- "Based on the foregoing case law, Plaintiff has stated a colorable First Amendment claim upon which he can proceed regarding his religious books and clergy visit claims."

- "To the extent that Plaintiff has asserted a First Amendment free speech claim based on the limited number of books he is permitted to keep in his cell, he may not proceed, because he has failed to state a claim upon which relief can be granted."

- "Plaintiff has set forth colorable RLUIPA claims upon which he can proceed regarding his claim that he must sacrifice religious books to be able to check out mental health books recommended by his health care provider, and that he is being denied clergy visits."

- "RFRA continues to be a viable cause of action against only the federal government.  Plaintiff cannot proceed under the RFRA."

- "[B]ecause Plaintiff could check out the self-help books *but for* the religious books issue and because Plaintiff has not shown that the books are medically necessary for his mental health condition, the Court concludes that this fails to state an Eighth Amendment claim that his right to mental health care is being denied."

Initial Review, pp. 4-8 (Docket No. 6). The Court allowed Plaintiff to "proceed on his religious claims under the First Amendment and RLUIPA." *Id.* at p. 9. Defendants now move for summary judgment as to these remaining claims.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). there must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The moving party will prevail if that party shows that each issue of material fact is not or cannot be disputed. To do so, a party may cite to particular materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. *See* Fed. R. Civ. P. 56(c)(1)(A) & (B); *Ransier v. United States*, 2014 WL 5305852, *2 (D. Idaho 2014).

Rule 56(e)(3) allows summary judgment "if the motion and supporting materials –

including the facts considered undisputed – show that the movant is entitled to it."  A scintilla of

evidence in opposition is insufficient, as the evidence must allow a jury to "reasonably find for

the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.  DISCUSSION

During the time he was incarcerated in administrative segregation[3] at ISMI,[4] Plaintiff

believed that (1) he should have been allowed to have more than the five books permitted under

IDOC Policy because of his contention that more than five books were necessary for him to

practice his religion, and (2) he should have been allowed to have regular, in-person, clergy

visits. He did not have those things (at least while housed in administrative segregation) and,

because of that, Plaintiff brings First Amendment claims against Defendants Ramirez, Valley,

and Kirtley, in their individual capacities.[5]  Those Defendants have moved for summary

---

[3]  The Court understands that a component of Plaintiff's grievances *in toto* relate to him being housed in administrative segregation due to institutional reasons (overcrowding), not anything that he did/did not do.  *See, e.g.*, 9/7/14 Letter (Docket No. 3, Att. 4, pp. 1-4) ("I should be protective custody but can't be placed there for Institutional reasons not because of anything I've done wrong . . . .").  However, protective custody is "[a] form of administrative segregation that is used to protect an offender." SOP 319.02.01.001, attached as Ex. A to Zmuda Aff. (Docket No. 46, Att. 4, p. 1).  Moreover, at least around the time of April 2015, Plaintiff was held in administrative segregation for flooding his cell with urine and throwing feces at his door. *See* 11/14/16 Order, p. 1 (Docket No. 42).  Therefore, for the purposes of this Memorandum Decision and Order, the Court considers Plaintiff's claims in the context of his proper administrative segregation designation.

[4]  As indicated during oral argument, Plaintiff's request for equitable relief under RLUIPA is moot given his transfer from Idaho to Utah during the pendency of this action.  *See supra*.  With this in mind, only Plaintiff's claim for damages under the First Amendment remain and, as such, is considered here.

[5]  Plaintiff agrees that he is not pursuing official capacity claims against these individual Defendants – only individual capacity claims.  *See* Opp. to MSJ, pp. 4-5 (Docket No. 50) ("Defendants claim they are entitled to Eleventh Amendment immunity for their official capacity claims.  This claim should not even be considered by the court as the Defendants are sued in their personal capacities.").

judgment, arguing that Plaintiff's claims cannot stand as a matter of law, that the Defendants are entitled to qualified immunity, and Plaintiff cannot prove a First Amendment violation as to either IDOC's five-book policy or the religious advisor access policy for inmates in restrictive housing. *See generally* Defs.' Mem. in Supp. of MSJ (Docket No. 46, Att. 1).

Qualified immunity shields government officials performing discretionary functions from civil liability if their actions were objectively reasonable in light of clearly established law at the time they acted. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has prescribed a two-pronged inquiry for determining whether a public official is protected by qualified immunity. First, the trial court examines the facts alleged in the light most favorable to the plaintiff and determines whether the officer's alleged conduct violated a constitutional right. Second, the trial court decides whether that right was clearly established at the time of the alleged violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The inquiry can begin with either of the two prongs. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the latter prong, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 553 U.S. at 202; *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right). If an official's alleged conduct violated a clearly established right of which a reasonable officer would have known, he is not entitled to qualified immunity. *See id*.

Applying this standard (and, in doing so, assuming but not deciding for these purposes that Plaintiff has a viable First Amendment claim), the law is not sufficiently clear that Defendants *would have known* that Plaintiff's First Amendment rights had been violated by their respective conduct when applying the at-issue IDOC policies to Plaintiff's grievances/concerns.

It is undisputed that, pursuant to IDOC policies, inmates held in administrative segregation (1) may possess only five books at one time, and (2) can request a visit with a religious advisor. *See* SOP 320.02.01.001, Appendix C, p. 1, attached as Ex. C to Zmuda Aff. (Docket No. 46, Att. 6) (chart outlining "**Restrictive Housing Property**," including limitation on "books, publications, religious" (five) for inmates held in administrative segregation) (emphasis in original); SOP 403.02.01.001 at ¶ 11, attached as Ex. E to Zmuda Aff. (Docket No. 46, Att. 8) (discussing "**Inmate Request for Access to a Religious Advisor**": "Inmates in restrictive housing can submit a written request to the facility VRC [(volunteer and religious activity coordinator)] requesting access to a religious advisor. The facility VRC must contact a religious volunteer or approved representative of the faith and arrange a visit consistent with security and order of the facility. Religious volunteers and faith group representatives must always be escorted or under staff observation when visiting inmates in restricting housing.") (emphasis in original).[6]

And, with respect to Defendants Valley and Kirtley, there is no allegation that either of them declined Plaintiff's request for additional books or regular in-person clergy visits in a manner inconsistent with these polices. Instead, Plaintiff argues that such policies, as applied by these Defendants to him, are unconstitutional – in short, he wants more than what these polices

---

[6] This is *in addition* to the VRC's obligation to perform monthly visits in long-term restrictive housing:

> The facility VRC providing service at any facility with long-term restrictive housing is required to visit each unit and tier at least once each month, making himself available to any inmate with questions or concerns regarding religious or volunteer activities. The facility VRC must document such visit and submit the documentation to the division VRC on a monthly basis in a format determined by the division VRC.

SOP 404.02.01.001 at ¶ 11, attached as Ex. E to Zmuda Aff. (Docket No. 46, Att. 8) (identifying "**Facility VRC Requirements**") (emphasis in original).

allow. *See, e.g.*, 9/24/14 Offender Concern Form (Docket No. 3, Att. 3, p. 7) (Plaintiff stating

that SOP 320 "is outdated and illegal."); 10/14/14 Grievance/Appeal Form (Docket No. 3, Att. 3,

p. 1) ( "(1) Change the Policy, (2) Move me or (3) Prepare for Court"); 11/7/14 Offender Appeal

(Docket No. 3, Att. 2, p. 18) ("(1) Change the book policy (2) Move me (3) Prepare for Court,

also (4) allow me a memo to study my religion and have the books I need."). This is not enough.

By all accounts, Defendants Valley and Kirtley followed IDOC protocol vis à vis

Plaintiff's allegations against them. The Ninth Circuit has ruled that a defendant is entitled to

qualified immunity if he or she acts pursuant to official prison policies if the policies are not

themselves "patently violative of constitutional principles." *Brown v. Mason*, 288 Fed. Appx.

391, 392-93 (9th Cir. 2008); *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999);

*Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994). As explained in *Grossman*:

> As with most legal matters, there are no absolutes here. On the one hand, an officer
> who acts in reliance on a duly-enacted statute or ordinance is ordinarily entitled to
> qualified immunity. On the other, as historical events such as the Holocaust and
> the My Lai massacre demonstrate, individuals cannot always be held immune for
> the results of their official conduct simply because they were enforcing policies or
> orders promulgated by those with superior authority. Where a statute authorizes
> official conduct which is patently violative of fundamental constitutional
> principles, an officer who enforces that statute is not entitled to qualified immunity.
> Similarly, an officer who unlawfully enforces an ordinance in a particularly
> egregious manner, or in a manner which a reasonable officer would recognize
> exceeds the bounds of the ordinance, will not be entitled to immunity even if there
> is no clear case law declaring the ordinance or the officer's particular conduct
> unconstitutional.

*Grossman*, 33 F.3d at 1209-10. Here, neither IDOC policy forecloses an inmate's ability to

exercise his religious rights via religious texts or clergy visits. If that was the case (no books or

clergy visits allowed per institutional policy), a strong argument would exist that such policies

were so "patently violative of constitutional principles," that, if followed, qualified immunity

would not apply. But that is not this case. The IDOC policies explicitly permit such things, just

not to the extent that Plaintiff would like (or without the limitations that exist, owing to the

**MEMORANDUM DECISION AND ORDER - 21**

administrative segregation environment).  *See, e.g.*, Zmuda Aff., ¶¶ 15-20, 23-25 (Docket No.

46, Att. 3) (discussing allegedly compelling government interest for limitations, utilized in least

restrictive means).  While the Court will not say here whether those reasons absolutely satisfy

constitutional muster as a matter of law, the Court does hold that a reasonable person in

Defendant Valley's or Kirtley's position would not have known that the conduct authorized by

IDOC's policies was either not in compliance with the law, or, at the very least, so patently

violative of fundamental constitutional principles.  Hence, Defendants Valley and Kirtley are

entitled to qualified immunity.

On the other hand, Defendant Ramirez's situation is not as straight-forward.  As the

warden and "facility head" at ISMI, his is a dual role – in one setting, he is arguably following

policy, but in another setting he is arguably making policy, even if on a case-by-case basis.[7]

Still, in denying Plaintiff's requests for additional books and regular in-person clergy visits (that

is, in not making discretionary exceptions to IDOC policy), it goes too far to say that Defendant

Ramirez himself has committed constitutional violations in each instance.  To be clear,

Plaintiff's complaint with Defendant Ramirez is that Ramirez did not deviate from IDOC

---

[7] The Court is not persuaded by Defendants' argument that Defendant Ramirez is neither a policy maker, nor has the authority to implement or modify IDOC policy.  *See* Mem. in Supp. of MSJ, p. 4 (Docket No. 46, Att. 1).  According to SOP 320.02.01.001, Defendant Ramirez can grant exceptions to property limitations.  *See* SOP 320.02.01.001 at ¶ 4, attached as Ex. C to Zmuda Aff. (Docket No. 46, Att. 6) ("The facility head or designee may approve special items. . . . .  Special items must be documented with a memorandum signed by the facility head or designee and must specify an expiration date, which cannot exceed one year.  At the end of the expiration date, the facility head or designee can issue another memorandum if appropriate, or remove the special item from the facility . . . ."); *see also* Mem. in Supp. of MSJ, p. 5 (Docket no. 46, Att. 1) ("The facility head, Warden Ramirez in this instance, can then determine whether an exception to the policy should be permitted for that specific inmate based on the request, the institutional history, and in conjunction with any information from other involved staff (deputy Wardens, Housing Sergeants, and the VRC.").  As stated during oral argument, if the policy is such that Ramirez makes decisions based on particular factual circumstances, then the policy is nothing at all unless and until the warden makes such decisions.  In short, Plaintiff is correct; this conduct represents policy making.  *See, e.g.*, Opp. to MSJ, pp. 8-9 (Docket No. 50).

policies. *See* Opp. to MSJ, pp. 10-11 (Docket No. 50) ("Even here in their own sub-part they

admit the policy is flexible and that defendant A. Ramirez can modify and make exceptions, *yet*

*he refused and this is why he is a defendant because he chose to ignore that very flexibility of the*

*policy and chose to implement his own agenda.*") (emphasis added). On this record, the fact of

refusing Plaintiff's requests for certain accommodations and defaulting to IDOC policy, without

more, does not establish a constitutional violation.

Defendants do not dispute that it is clearly established that Plaintiff and other prisoners

have a First Amendment right to practice one's religion. *See* Reply in Supp. of MSJ, p. 4

(Docket No. 52). However, Plaintiff provides no legal authority supporting his claim that his

First Amendment rights are violated because he is not allowed to possess more than five books at

any one time.[8]  To the contrary, such protocols are consistent with the Federal Bureau of Prisons

---

[8] Defendants contend that, "[a]t no point in time, did Plaintiff assert to Defendants that his religious practice was hindered or prevented because he was limited to only five books." Mem. in Supp. of MSJ, p. 8 (Docket No. 46, Att. 1). However, Plaintiff claims that on multiple occasions he told prison officials that the five-book limit prevented him from practicing his religion, and the record supports his claim in that regard. *See* 9/29/14 Grievance/Appeal Form (Docket No. 3, Att. 3, p. 4) ("The number of books allowed to me in Ad-Seg under SOP 320 is (5) five this does not even allow enough books for me to exercise my religious rights . . . ."); 10/14/14 Grievance/Appeal Form (Docket No. 3, Att. 3, p. 1) ("This does not allow me enough books to exercise my Freedom of Religion . . . ."); 11/7/14 Offender Appeal (Docket No. 3, Att. 2, p. 18) ("D.W. Kirtley has no clue how many books it takes to exercise the Christian religion."); 11/6/14 Offender Concern Form, attached as Ex. A to Ramirez Aff. (Docket No. 46, Att. 18) (". . . plus exercising my own religion it takes more than 5 books."); 1/26/15 Notice of Claim (Docket No. 3, Att. 2, p. 13) ("Prison . . . limits books to (5) five which does not allow enough to exercise religion of 1st Amendment rights."); 8/3/15 Letter (Docket No. 3, Att. 4, pp. 9-11) ("Here's what I need [(followed by listing of various legal texts/correspondence)]). Even so, this only indicates that Plaintiff did not have *everything* he wanted by way of his own personal library. *See, e.g.*, Support, p. 4 (Docket No. 50, Att. 4) ("I also need expert witnesses to clearly testify to the number of books needed for daily worship as a Messianic Jew (Christian) there literally are hundreds of texts . . . ."); 12/17/14 Offender Concern Form, attached as Ex. E to Ramirez Aff. (Docker No. 46, Att. 22) ("What I personally want from you [(Ramirez)] is . . . a Memo allowing me to possess the number of Religious books I need to study and exercise my Religion."); 8/12/15 Offender Concern Form (Docket No. 3, Att. 3, p. 17) ("I need a Memo for Religious Studies to authorize me to possess more than (5) books so I can continue my Education."). In this respect, it is important to remember that IDOC does not place any limit on

policies on "Special Housing Units" and "Religious Beliefs and Practices." *See* USDOJ, Federal

Bureau of Prisons "Special Housing Units," attached as Ex. A to Hayes Aff. (Docket No. 46, Att.

24) ("Bible, Koran, or other scriptures (1). Books, paperback (5) . . . . **Reading Material.** The

inmate will receive a reasonable amount of non-legal reading material, not to exceed five books

per inmate at any one time, on a circulating basis. Staff shall provide the inmate the opportunity

to possess religious scriptures of the inmate's faith."); *see also, e.g.*, *Garraway v. Lappin*, 490

Fed. Appx. 440, 445 (3rd Cir. 2012) (Bureau of Prisons regulation that limited number of books

that federal inmate could have as person property in his cell to five did not impermissibly

impinge on inmate's free exercise of his region in violation of his First Amendment rights).

Other prisons' similar policies can be indicative that the right was not clearly established. *See*

*Warsoldier v. Woodford*, 418 F.3d 989, 999-1000 (9th Cir. 2005).[9]

---

the number of books that an inmate may read, but only on the number of books that an inmate may possess at any given time. *See* Zmuda Aff., ¶ 19 (Docket No. 46, Att. 3). Thus, whatever space is created between the five books permitted to Plaintiff and the other "hundreds of texts" Plaintiff also wants, does not, on its own, clearly establish a constitutional violation.

[9] The Court has reviewed the "List of Mental Health Books" that Plaintiff claims he was unable to check out due to IDOC's five-book limitation policy, finding them largely unrelated to mental health issues. *See* List (Docket No. 3, Att. 1) (containing such titles as: "Complete Idiot's Guide to Success as a Teacher," "Discovery Your IQ Potential," "Chicken Soup for the Cat and Dog Lover's Soul," "Master Key to Riches," "Pictorial History of Philosophy," "Think and Grow Rich," "Communication: Sex and Money," "100 Best Careers for the 21st Century," "200 Best Jobs for College Graduates," "225 Best Jobs for Baby Boomers," "250 Best Jobs Through Apprenticeships," "250 Best-Paying Jobs," "300 Best Jobs Without a Four-Year Degree," "Best Jobs for the 21st Century," "20th Century Bookkeeping and Accounting," "Learning to Budget," "The Small Investor: Beginner's Guide to Stocks, Bonds & Mutual Funds," "International Economics," "Thog's Guide to Quantum Economics," "Economics: Wealth for All," "Intermediate Microeconomics," "Double Your Reading Speed," "Pocket Guide to Correct Spelling," "Basic English: Grammar and Composition," "Practical German Review (Grammar)," "Words Most Often Misspelled and Mispronounced," "Whose Grammar Book is This Anyway," "Concise English Handbook," "Excursions Into Mathematics," "Algebra and Trigonometry," "Painless Fractions," and "1001 Ways to be Romantic"). Plaintiff fails to identify which of these books are necessary for the purposes of maintaining his mental health.

And, though the Free Exercise Clause guarantees certain substantive rights, it does not guarantee that religious sects be treated alike in all respects. *See Cruz v. Beto*, 405 U.S. 319 (1972); *see also Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987) (prisoner is not entitled to have clergyman of his choice provided for him in prison). This is particularly so in a protective custody/administrative segregation setting where communal religious services are difficult to coordinate and where requests for religious advisor access cannot be regularly accommodated. As the Deputy Director for IDOC explains:

> Since how the religious visits will be managed is based on the needs of the individual facility, the particular inmate, and the burden on staff, whether the visit occurs cell-side is made on a case-by-case basis due to specific institutional needs. Additionally, since the restrictive housing inmates cannot be in general population, cell-side visits may be an appropriate alternative to prevent a violent, disruptive, or vulnerable inmate from being exposed to other inmates. This helps to maintain safety and security of the facility. Restrictive housing inmates are not denied religious advisor visits and per policy [(SOP 403.02.01.001)] are provided with visits monthly from the VRC or as requested by the inmate through the VRC. How frequently community volunteers are able to attend and visit inmates depends on the religion and the availability of volunteers within the community.

Zmuda Aff., ¶¶ 24-25 (Docket No. 46, Att. 3).

So, this is not a situation where Plaintiff is being denied access to religious advisors. *Compare* SOP 403.02.01.001 at ¶ 11, attached as Ex. E to Zmuda Aff. (Docket No. 46, Att. 8), *with* USDOJ, Federal Bureau of Prisons "Religious Beliefs and Practices," attached as Ex. B to Hayes Aff. (Docket No. 46, Att. 25) ("Upon written request, inmates may also have access to recognized representatives of their faith groups while in [segregated housing units]."); *see also Warsoldier*, 418 F.3d at 999-1000. If that were happening, a violation of a clearly-established constitutional right would likely exist. Rather, this is a situation where, owing to the circumstances necessarily present in an administrative segregation setting, Defendant Ramirez simply could not make a generalized exception to IDOC policy and permit Plaintiff regular out-of-cell personal clergy visits. *See* 12/17/14 Offender Concern Form, attached as Ex. E to

Ramirez Aff. (Docker No. 46, Att. 22) ("What I personally want from you [(Ramirez)] is at least 2 out of cell personal clergy visits per month . . . ."). Plaintiff may feel that his requests for clergy visits were not as efficiently processed as he would like (*see supra*),[10] but this does not amount to a constitutional violation in and of itself, or, even if so, one that was clearly established at the time Ramirez considered and processed Plaintiff's appeal on this issue.[11] In this setting, Defendant Ramirez is also entitled to qualified immunity.

Each Defendant named in Plaintiff's Complaint is entitled to qualified immunity for the individual capacity claims asserted against them. Accordingly, Defendants' Motion for Summary Judgment is granted and Plaintiff's claims are dismissed.

## IV.   ORDER

Based on the foregoing, IT IS HEREBY ORDERED that (1) Defendants' Motion for Summary Judgment (Docket No. 46) is GRANTED, and (2) Plaintiff's Motion for Appointment of Counsel (Docket No. 62) is DENIED as moot.

DATED: March 30, 2018

_____
Ronald E. Bush
Chief U.S. Magistrate Judge

---

[10] In this respect, Plaintiff's complaints appear to be more directed at VRC Wright, not Defendant Ramirez. *See, e.g.*, 5/23/15 Offender Concern Form (Docket No. 3, Att. 3, p. 14) (Plaintiff asking: "You know I'm not a Catholic. I'm a non-denominational Christian. Why would you bring a Catholic Clergy person to me? Please send me a Christian Clergy person [undecipherable]," with VAC Wright responding: "You asked for a volunteer – I brought a volunteer.").

[11] Even if *Griffin v. Coughlin*, 743 F. Supp. 1066 (N.D.N.Y. 1990) can be read to support Plaintiff's argument that inmates in administrative segregation are constitutionally guaranteed "truly private meetings" with religious advisors, that holding is not binding in this District and therefore does not operate to clearly establish any such right for the purposes of a qualified immunity analysis as to Defendant Ramirez.